STATE

v.

John LOUGH.

No. 2005–93–C.A.

Supreme Court of Rhode Island.

June 8, 2006.

Christopher R. Bush, Esq., for Plaintiff.

Michael Colucci, Esq., Warwick, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

**OPINION**

Justice FLAHERTY, for the Court.

The defendant, John Lough, appeals conviction after a jury found him guilty of embezzlement and fraudulent conversion in violation of G.L.1956 § 11–41–3. Lough maintains that the trial justice incorrectly instructed the jury on the elements required to return a conviction under the applicable statute. He further contends that the trial justice should have granted his motions for judgment of acquittal and motion for new trial. For the reasons set forth herein, we deny the defendant's appeal and affirm the judgment of conviction.

## I

### Background

After a jury trial in May 2004, John Lough, a patrolman in the Providence Police Department, was convicted of embezzling and fraudulently converting a child's minibike, valued at approximately $350. Sometime around midnight on July 14, 2003, Lough stopped to aid a fellow officer, Thomas Teft. Officer Teft had detained a juvenile, Shane, because he suspected that the young man was operating a stolen minibike. Officer Teft's suspicions were further aroused because Shane was unable to produce proof of ownership and the vehicle identification number had been partially scratched off the surface of the bike. Despite these dubious circumstances, Officer Teft decided to give Shane a break because the youth insisted that he had recently purchased the bike and he claimed that he had to be at his new job early in the morning. So, rather than arresting him, Officer Teft decided to confiscate the bike and hold it at the police station until Shane could produce proof of ownership.

When Lough arrived at the scene, Officer Teft explained to him that he was unsure about the protocol for confiscating the minibike. Officer Teft's anxiety was heightened because, as a new officer, he still was on probationary status with the department. As a result, the more experienced Lough offered his assistance by volunteering to take possession of the bike and complete the necessary paperwork. Officer Teft accepted this offer and he loaded the bike into the back seat of Lough's police cruiser. After he and Officer Teft went their separate ways, Lough removed the bike from the back seat and placed it in the trunk of the vehicle because it smelled of fuel and had fallen forward against his seat.

A short time later, as Lough and several other officers were responding to a report of a stolen vehicle, his cruiser struck the back of another officer's patrol car, apparently because of faulty brakes. Lough's supervisor instructed him and the officer driving the other vehicle to return to the police station to complete paperwork related to the accident. After finishing the paperwork, Lough left the police station intending to bring his damaged cruiser to a repair facility known as the Bucklin Street Garage.

Lough said he remembered that Shane's minibike still was in the trunk of his car while he was on his way to the garage. Lough testified at trial that because he was aggravated by the evening's events and anxious to go home, he "made a wrong decision" and decided to rid himself of the bike by leaving it behind a dumpster. He assumed that the young man would never return to claim the bike, but this assumption proved to be wrong and Shane arrived at the police station the next morning with his mother to reclaim the confiscated bike.

During the hours that followed, department personnel searched the police station and some of the cruisers for the minibike, but they were unable to locate it. The investigation quickly led to Officer Teft, who told the Internal Affairs Division that he had turned the bike over to Lough after he confiscated it the previous night. After this conversation, Officer Teft telephoned Lough regarding the whereabouts of the bike. Lough told him, "Don't worry, I'll take care of it."

Now knowing that Shane intended to reclaim the bike, Lough arranged to meet with Officer Steven Petrella, a fellow officer and friend, at a parking lot in Cranston. According to Lough, he then drove to the dumpster where he had discarded the bike, placed it in his personal vehicle, and drove to the parking lot to meet Offi-

cer Petrella. The two officers met around 8 p.m., and Lough placed the minibike into the trunk of Officer Petrella's cruiser.

Later that evening, investigators from Internal Affairs questioned Officers Lough and Petrella about the minibike. Neither officer was forthcoming with details concerning the bike, and neither of them mentioned the parking-lot rendezvous that had taken place earlier that night. Lough told one of the inspectors that after he was involved in the car accident with another officer, he transferred the bike to the trunk of Officer Petrella's car. However, he did not disclose that he left the bike at the dumpster site and transferred it to Petrella's car only after the investigation had started. Officer Petrella told another inspector that the bike had been in the trunk of his car at the start of his shift. But the department knew this statement to be false because the car had been searched earlier that day, and the minibike was not in it.

As the case of the missing minibike continued, Lough eventually came forward with his story about the dumpster, asserting that he had discarded the bike because he believed that Shane would never return to claim it. In August 2003, Lough was indicted on one count of embezzlement and fraudulent conversion in violation of § 11–41–3. Following a four-day trial in May 2004, a jury returned a verdict of guilty and Lough was fined $1,000 and received a one-year suspended sentence. The defendant timely appealed.

On appeal, Lough contends that the trial justice misinterpreted § 11–41–3 and incorrectly instructed the jury that a person could violate the statute by disposing of the property of another. On the basis of this same alleged misinterpretation of the law, he maintains that the trial justice improperly denied his motions for judgment of acquittal and his motion for new trial. Lough's claims of error all hinge on one central issue: whether a person who is lawfully entrusted with property and throws the property away can be convicted of embezzlement and fraudulent conversion pursuant to § 11–41–3 in the absence of proof that he derived a benefit from using the property.

## II

### Standard of Review

■■■ This Court applies *de novo* review to questions of statutory construction. *State v. Santos*, 870 A.2d 1029, 1031 (R.I. 2005). In so doing, "[p]enal statutes must be strictly and narrowly construed." *State v. Powers*, 644 A.2d 828, 830 (R.I.1994) (citing *State v. Dussault*, 121 R.I. 751, 753, 403 A.2d 244, 246 (1979)). "[I]n the absence of an ambiguity, this court must give the words of the statute 'their literal and plain meaning.'" *Id.* (quoting *State v. Oliveira*, 432 A.2d 664, 666 (R.I.1981)).

## III

### Analysis

■■ To determine whether a conviction for embezzlement and fraudulent conversion under § 11–41–3 requires proof that a defendant derived a benefit from his use of the property, we begin our analysis with the language of the statute itself. Section 11–41–3 provides in relevant part as follows:

> "**Embezzlement and fraudulent conversion.**—Every * * * officer, agent, clerk, servant, or other person to whom any money or other property shall be entrusted for any specific purpose * * * who shall embezzle or fraudulently convert to his or her own use * * * any money or other property which shall have come into his or her possession or shall be under his or her care or charge

by virtue of his or her employment * * * shall be deemed guilty of larceny * * *."

In *Oliveira*, this Court outlined the elements of proof required to sustain a conviction under § 11–41–3. We explained that the state must establish the following:

"(1) that defendant was entrusted with the property for a specific use, (2) that he came into possession of the property in a lawful manner, often as a result of his employment, and (3) that defendant intended to appropriate and convert the property to his own use and permanently deprive that person of the use." *Oliveira*, 432 A.2d at 666.

Lough concedes that he was lawfully entrusted with the minibike for the specific purpose of delivering it to the police station. Thus, there is no dispute that the state satisfied the first two elements required to sustain a conviction. He also admitted during trial that when he threw the bike away, he intended to permanently deprive the owner of its use. He maintains, however, that this is insufficient to sustain a conviction because the state also must establish that he "convert[ed] the property to his own use." According to him, this third element of proof requires evidence that he derived some personal gain from using the property.

To support this position, Lough contends that our holding in *Powers* stands for the proposition that a person cannot be convicted under § 11–41–3 without evidence that he derived a benefit from using the property in question. In that case, the defendant, Robert Powers, was working as the director of maintenance for a school department when, using a school account, he ordered certain material valued at $1,200 and had it delivered to a private company, all in exchange for goods and services to be used by the school. After school officials learned of the transaction,

Powers was charged with embezzlement and fraudulent conversion in violation of § 11–41–3. Although the barter agreement was unauthorized, there was no evidence that Powers had personally used the school department's property or derived a benefit from its use. Therefore, the Superior Court granted his motion to dismiss for lack of probable cause. The state appealed, and we affirmed. Relying on our previous holding in *Oliveira* and the plain language of § 11–41–3, we explained that "an element of the crime charged is that defendant put the property to 'his own use' or used the property for his own benefit." *Powers*, 644 A.2d at 830.

Citing our language in *Powers*, Lough contends that the trial justice's instruction misstated the elements of proof required to sustain a conviction under § 11–41–3. The disputed instruction stated in part as follows:

"The elements that the State must prove beyond a reasonable doubt in order to convict this defendant are as follows: Number one, that the defendant was entrusted with the property for a specific use or purpose; two, that he came into possession of that property in a lawful manner, and, three, that the defendant intended to appropriate and convert the property to his own use and permanently deprive that person of its use.

"A conversion of property requires a serious act of interference with the owner's rights, using up the property, selling it, pledging it, giving it away, delivering it to one not entitled to it and inflicting serious damage to it, claiming it against the lawful owner, unreasonable withholding possession of it from the owner *or, otherwise, disposing of the property.* Each of these acts seriously interferes with the ownership rights and so constitutes a conversion." (Emphasis added.)

When the jury asked for clarification on what constitutes conversion, the justice stated:

> "When a person having possession of another's property treats the property as his own, whether he sells it, uses, or *disposes of it*, he is using the property for his own purpose." (Emphasis added.)

Lough argues that by instructing the jury that a person converts property to his own use by disposing of it, the trial justice permitted the jury to return a guilty verdict in the absence of evidence that he derived a benefit from his use of the mini-bike. This distinction is of paramount importance because Lough conceded in his testimony that he threw the minibike away. Thus, if the act of throwing the minibike away constitutes conversion, Lough's testimony was essentially an admission of guilt.

■ This Court has not squarely addressed what it means to fraudulently convert property to one's "own use" under § 11–41–3. Contrary to Lough's assertion, however, *Powers* does not hold that a person must derive a personal gain from using the property to be convicted under § 11–41–3. Although we noted that the defendant in *Powers* did not derive a benefit from the bartering transaction, this observation simply underscored the fact that he did not convert the property to his own use, as required by the plain language of the statute. In fact, we clearly stated that the trial court's dismissal of the charge against the defendant was warranted because there was no evidence that he had put the property to his own use. Therefore, under our holding in *Powers* and under the language of the statute, the relevant inquiry is not whether Lough de-

rived a benefit from throwing the bike away, but rather, whether he put the property to " 'his own use.' " *Powers*, 644 A.2d at 831.

Although we have not previously considered whether a person puts property to his own use by disposing of it, other jurisdictions have held that a person puts property to his own use when he treats it as if it were his own, even in the absence of a measurable benefit. For example, in *United States v. Santiago*, 528 F.2d 1130, 1135 (2d Cir.1976), the Second Circuit Court of Appeals explained as follows:

> "The phrase 'to his own use' is a carry over from the common-law pleading in trover, * * * and does not require a showing that the misappropriation was for the personal advantage of the defendant. * * * *One's disposition of the property of another, without right, as if it were his own, is a conversion to one's own use.*"

The Court of Appeals of New Mexico similarly held in *State v. Archie*, 123 N.M. 503, 943 P.2d 537 (Ct.App.1997), that "[w]hen a person having possession of another's property treats the property as his own, whether he uses it, sells it, or discards it, he is using the property for his own purpose." *Id.* at 540.

When the trial justice rejected Lough's objection to the jury instruction and denied his motions for judgment of acquittal and new trial, he cited *Santiago* and *Archie*, as well as legal treatises, to support his conclusion that disposing of property constitutes conversion within the meaning of § 11–41–3.[1] Lough contends that it was improper for the trial justice to rely on these sources because they are contrary to our holding in *Powers*. However, as noted, *Powers* did not define conversion to

---

1. *See* 3 Wayne R. LaFave, *Substantive Criminal Law*, § 19.6(b) (2d ed.2003); Rollin M. Perkins, *Criminal Law*, § 3(c) at 292 (2d ed.1969).

require proof of personal gain, nor did it foreclose the possibility that a person may convert property by throwing it away.

In our opinion, a person puts property to his own use when he treats it as his own, and when a person discards property, he treats it as his own. This interpretation of the statute is consistent with the plain meaning of the words used by the Legislature. *See State v. Dussault,* 121 R.I. 751, 754, 403 A.2d 244, 246 (1979) (Court will not interpret statute in a manner that defeats clear legislative intent). When Lough decided to dispose of the minibike that had been entrusted to him, he made a decision that was properly vested in its lawful owner; in other words, by discarding the property as if it were his own, Lough converted it to "his * * * own use." Section 11–41–3. We therefore hold that the trial justice correctly instructed the jury on the elements of proof necessary to sustain a conviction under § 11–41–3.

In light of this holding, we reject Lough's additional claims of error concerning the denial of his motions for judgment of acquittal and motion for new trial. His only argument concerning these motions is that the trial justice misinterpreted § 11–41–3. Because the justice correctly interpreted the statute, we hold that these motions were properly denied.

### IV

### Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record in this case shall be remanded to the Superior Court.