### STATE

v.

### Roger GRAHAM.

### No. 2006–88–C.A.

Supreme Court of Rhode Island.

Feb. 28, 2008.

Jane M. McSoley, Esq., Providence, for Plaintiff.

Robert B. Mann, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

**OPINION**

Justice FLAHERTY, for the Court.

On January 1, 2002—on what should have been a joyous day filled with anticipation of the new year—a lone gunman entered the Founder's Brook Motel in Portsmouth, shot and killed the hotel manager, Sanjeev Patel, in front of his eight-year-old son, and left the victim's bullet-riddled body for his wife to discover. In an effort to explain what at first appeared to be a random act of violence,[1] the police conducted countless interviews with persons of interest living in the Portsmouth area and nearby towns, as well as members and acquaintances of the extended Patel family. Almost three months after the murder, law enforcement's dogged investigation concluded in New Orleans, some 1,500 miles from the scene of the brutal crime, at the doorstep of the defendant Roger Graham's girlfriend. Based on their investigation, the police soon came to suspect that Tajendra Patel (T.J.), Sanjeev's brother-in-law, and the defendant both were involved in the murder of the victim.

After further police investigation that disclosed a number of untruths by defendant, he was charged with first-degree murder, in violation of G.L. 1956 § 11–23–

---

1. Jay and Prena Patel, the victim's son and wife, respectively, both saw the shooter but did not recognize him.

1, discharging a firearm during the commission of a crime of violence, in violation of G.L. 1956 § 11–47–3.2, and conspiracy, in violation of G.L. 1956 § 11–1–6.[2] After two mistrials, a third jury convicted defendant of all three charges and the trial justice sentenced him to life imprisonment without the possibility of parole for the murder charge, a life sentence for discharging a firearm during the murder to be served consecutively to the life-without-parole sentence, and an additional consecutive ten-year sentence at the Adult Correctional Institutions (ACI) for the conspiracy.

The defendant timely appealed to this Court. He argues that the trial justice: (1) gave improper instructions to the jury, (2) incorrectly ruled on various evidentiary issues, (3) erroneously denied defendant's motion for a judgment of acquittal on the conspiracy charge, (4) erred in the life-without-parole proceedings and sentence, and (5) erred in not appointing defendant additional counsel for his third trial. After careful review, and for the reasons set forth below, we reject defendant's contentions and affirm both the judgment of conviction and the sentence.

# I

## Facts and Procedural History

We begin our focus on this sordid and tragic tale, on December 31, 2001, when defendant and his friends Monty France and Hubert Gordon, known as "Tall Man," left Brooklyn and drove north on Interstate–Route 95 in Tall Man's 1992 Ford Taurus. According to defendant, he en-listed the help of these two confederates after his friend T.J. Patel notified him of a profitable drug opportunity in Boston.[3] The defendant testified that the three planned to pick up a large quantity of marijuana, divide it amongst themselves, and then sell it for profit. However, Monty France and Dwayne Daniels, another one of defendant's friends, testified that defendant told them that the "job" T.J. proposed to defendant involved either a robbery or some other act of violence, and did not relate to drugs.

Regardless of the exact events that led to the threesome's northward trek, it is undisputed that their plans were derailed when Tall Man's car broke down and then was towed to a gas station in North Attleboro, Massachusetts. The men's luck continued to sour when they were spotted removing the license plates from Tall Man's car, prompting a call to the local police. Detective Daniel Arrighi of the North Attleboro Police Department was dispatched to the gas station to check out what appeared to be suspicious behavior. Detective Arrighi checked to see if any of the travelers were subjects of outstanding warrants and discerned that both France and Tall Man were; the detective promptly arrested them. The apprehension of his fellow travelers stranded defendant, who then called T.J. Patel for assistance. T.J. picked up defendant and brought him to the Capri Hotel in New Bedford, Massachusetts, where defendant spent the remainder of his New Year's Eve. The defendant testified that the following day, T.J. came to the hotel and the two drove

---

**2.** Although defendant also was charged with assault with the intent to rob, in violation of G.L. 1956 § 11–5–1, and two counts of conspiracy, in violation of G.L. 1956 § 11–1–6, the assault charge and one count of the conspiracy charge were dismissed before trial.

**3.** The defendant and T.J. had met in the fall of 2001 at a laundromat where defendant sold bootleg compact discs and dealt marijuana. The two men remained in contact after their initial introduction; defendant sold drugs with T.J. and procured a gun for him at T.J.'s request in December 2001.

around for some time, finally ending up in the vicinity of the Founder's Brook Motel in Portsmouth.

According to defendant's testimony, the events unfolded as follows. After defendant and T.J. parked near the motel, T.J. asked that defendant go into the motel office to see whether his wife, Komal, was working at the desk. The defendant said he agreed; he entered the motel office and asked the man behind the desk about room rates. When defendant returned to T.J.'s car and reported that there was a man, not a woman in the office, T.J. announced that he was going into the motel to "check for himself." The defendant testified that T.J. then removed something from the trunk of his car and walked toward the motel office while defendant remained in the car, talking on a cell phone. The defendant said that T.J. returned minutes later, carrying a gun in his hand. When defendant asked T.J. what happened, T.J. responded, "this f\*\*\*\*\*\* piece of s\*\*t gonna take my family away from me. I won't have that s \* \* t." The defendant testified that he and T.J. then drove to a gas station in Warwick, where T.J. dropped off defendant.

The testimonies of Jay and Prena Patel were starkly different with respect to the events surrounding the murder of Sanjeev. According to Jay, who was eight years old at the time of his father's murder, he was playing on a computer behind the office desk at the time of the killing. He said a black man with short black hair and wearing a black leather jacket and black gloves came to the office desk and asked about room rates. After Sanjeev provided him with the requested information, the man placed a $10 bill on the counter, said he would return after discussing the matter

with someone waiting outside, and left the office. Jay testified that soon after, the same man returned with a gun and yelled at Sanjeev to give him "all the money you have." Sanjeev responded: "Please sir. Please, sir. Please don't do that." The man then shot Sanjeev.

According to Prena, Sanjeev left their apartment to wait on a customer in the attached motel office. Prena testified that she heard several rings from the sensory bell in the office, which signaled entrances and exits of customers, and then heard raised voices, followed by what she thought was the sound of something crashing to the floor. When Prena went to see what had happened, she saw a man in a black jacket carrying a gun in his gloved hand, walking toward the exit. She followed the man, who turned and faced her as he left the motel lobby. Prena then locked the door behind him and ran to the office desk, where she found her son crouched over her mortally wounded husband. Prena directed her sister to call 9–1–1 and to tell the dispatcher that "some black guy shot my husband."

Officer Scott Travers of the Portsmouth Police Department was among the first responders at the motel. The officer found Sanjeev beneath the counter in the motel office, and testified that the victim showed no signs of life.[4] Officer Travers found five casings and four projectiles in the motel office, which later were determined to be from the same .45–caliber weapon.

After a long and exhaustive investigation, the police began to focus their attention on T.J. Patel, the husband of Prena's sister Komal. Through various witnesses, the police learned of the highly volatile

---

**4.** A postmortem examination of the victim revealed that he suffered three bullet wounds. Dorata Latuszynski, M.D. testified that Sanjeev died from massive bleeding caused by two of the wounds, specifically an injury to the left jugular vein from one bullet and extensive internal injuries sustained from another.

relationship between T.J. and his estranged spouse, Komal, and of T.J.'s intense anger toward Sanjeev, whom he blamed for breaking up his family. As the police questioned T.J. regarding his activities around the time of the killing, they learned of his acquaintance with defendant and, eventually, of defendant's possible involvement in the murder.

In the beginning of February 2002, defendant finally was tracked down in New Orleans at his girlfriend's house. When the Louisiana state police first arrived at the house, defendant identified himself as Sean Springer and he gave the officers his mother's Brooklyn address as his home address, even though he no longer resided there. When the police later questioned defendant at the police station, he denied knowing T.J. Patel and lied about his whereabouts on January 1, 2002.[5]

Further investigation culminated in the arrest of defendant for the killing of Sanjeev Patel. He was charged with first-degree murder, discharging a firearm during the commission of a crime of violence, and conspiracy. The defendant's first trial, which began on January 5, 2004, ended in a mistrial when the jurors pronounced themselves unable to agree upon a verdict. A second trial commenced on June 22, 2004, but the jury again was unable to reach a unanimous verdict. At defendant's third trial, which lasted twenty-six days and included more than thirty witnesses, defendant was convicted of all three charges. The defendant appealed his conviction and sentence to this Court, arguing that the trial justice erred in his (1) instructions to the jury, (2) rulings on various evidentiary issues, (3) denial of defen-

dant's motion for a judgment of acquittal on the conspiracy charge, (4) life-without-parole proceedings and sentencing of defendant, and (5) not appointing defendant additional counsel for his third trial.[6] Because we hold that the trial justice did not commit any reversible error, we affirm defendant's conviction. After an independent review, we also affirm the sentence of life imprisonment without the possibility of parole.

## II

### Jury Instructions

When this Court reviews jury instructions, it does so on a *de novo* basis. *State v. Imbruglia*, 913 A.2d 1022, 1031 (R.I.2007). We examine the charge "as a whole in light of the meaning and interpretation that a jury composed of ordinary, intelligent lay persons would give [to the instructions]." *Neri v. Nationwide Mutual Fire Insurance Co.*, 719 A.2d 1150, 1153 (R.I.1998) (quoting *Hueston v. Narragansett Tennis Club, Inc.*, 502 A.2d 827, 829 (R.I.1986)). In accordance with G.L. 1956 § 8–2–38, we determine whether the jury charge "sufficiently addresses the requested instructions and correctly states the applicable law." *State v. Mastracchio*, 546 A.2d 165, 173 (R.I.1988) (citing *State v. Tooher*, 542 A.2d 1084, 1088 (R.I.1988)). However, an incorrect charge warrants reversal only if a jury could have been misled to the prejudice of the complaining party. *Anter v. Ambeault*, 104 R.I. 496, 501, 245 A.2d 137, 139 (1968).

Using this standard, we review defendant's arguments that the trial justice erred (1) by providing the jury with instructions that differed from those used by

---

5. At trial, defendant explained that he lied to the police because he was afraid T.J. was trying to implicate him in the murder of the victim, when he was guilty only of "going to Boston to get a little weed."

6. We do not address defendant's final argument regarding the appointment of additional counsel because it has no merit.

the trial justice in defendant's previous mistrials, (2) by instructing the jury on vicarious liability, (3) by providing aiding-and-abetting instructions, and (4) by using an allegedly improper definition of "reasonable doubt" in the instructions.

### A. Law–of–the–Case–Doctrine

At the close of defendant's trial, he requested that the jury be provided the same instructions that were used at his previous trials in accordance with the law-of-the-case doctrine. The trial justice rejected defendant's request, reasoning that he was not obligated to use the same instructions and that he would charge the jury on the basis of the testimony and evidence adduced at the trial. On appeal, defendant argues that the trial justice was bound to use the same jury instructions under the law-of-the-case doctrine or that those instructions at least should have been afforded significant deference by the trial justice. The state counters that the trial justice's instructions were appropriate given the evidence presented at trial. It points out that the testimony and even the witnesses differed from previous trials.

■ Under the law-of-the-case doctrine, after a "judge has decided an *interlocutory matter* in a pending suit, a second judge on that same court, when confronted at a later stage of the suit with the same question in the identical manner, should refrain from disturbing the first ruling." *Richardson v. Smith,* 691 A.2d 543, 546 (R.I.1997) (citing *Salvadore v. Major Electric & Supply, Inc.,* 469 A.2d 353, 355–56 (R.I.1983)) (emphasis added). This doctrine ensures the stability of decisions and avoids contests between judges that could cause a loss of public confidence in the judiciary. *Payne v. Superior Court for Providence County,* 78 R.I. 177, 184–85, 80 A.2d 159, 163 (1951). We have declined to apply the doctrine where the "issue did not

present itself to the second judge in the same manner in which the first judge examined the issue." *Buonanno v. Colmar Belting Co.,* 736 A.2d 86, 87 (R.I.1999) (mem.).

■ We hold that the law-of-the-case doctrine is wholly inapplicable to the present situation; thus, the trial justice did not err when he provided jury instructions that differed from those used in defendant's prior mistrials. We do not believe this doctrine is remotely applicable here because decisions by the trial justice on how to charge the jury are not interlocutory rulings. Rather, we agree with various other jurisdictions that explicitly have held that decisions to use certain jury instructions in a trial ending in a mistrial are not binding in a subsequent trial. *See Lutheran Day Care v. Snohomish County,* 119 Wash.2d 91, 829 P.2d 746, 756–57 (1992); *Brown v. State,* 953 P.2d 1170, 1180–81 (Wy.1998). Indeed, G.L. 1956 § 8-2-38 requires only that the trial justice "to instruct the jury in the law relating to the action." Therefore, we hold that the trial justice did not err by using different instructions from those used in defendant's mistrials.

### B. Vicarious–Liability Instructions

■ Over defendant's objection, the trial justice provided the following instructions to the jury:

"[E]ach member of a conspiracy is vicariously responsible for every act done by a co-conspirator in carrying out the plan as one of its natural, probable or foreseeable consequences even though the act may not have been part of the original plan or even if it was forbidden by one of the co-conspirators or even though the defendant may not have personally participated in any of the actions which constitute the substantive criminal offense, in this case murder."

The trial justice explained that he included vicarious-liability instructions because the jury could find defendant guilty of murder even if the jury believed that T.J. Patel, not defendant, shot the victim. On appeal, defendant argues that the trial justice erred when he instructed the jury on vicarious liability because it was the state's sole theory that defendant shot the victim. The state contends that the trial justice properly included vicarious-liability instructions given the conspiracy charges against defendant and the evidence that was adduced at trial. The state also argues that any error in the instructions would not warrant reversal because defendant was convicted as a principal, and, therefore, was not prejudiced by the instructions.

■ After review of the record, we conclude that the vicarious-liability instructions were entirely proper in light of the conspiracy charge against defendant. Each member of a conspiracy is responsible, civilly and criminally, for acts in furtherance of such an unlawful purpose. *State v. Miller*, 52 R.I. 440, 445, 161 A. 222, 225 (1932). Thus, the trial justice properly instructed the jury on the basic legal principles surrounding conspiracy, a crime with which defendant was charged.

Furthermore, we believe the vicarious-liability instructions were necessary because the jury should have been instructed that it could convict defendant of murder if it found a conspiracy and that one of the conspirators killed the victim, no matter which of them pulled the trigger. Also, it seems to us that these instructions were especially appropriate when we consider the conflicting testimony about who shot the victim. The defendant's testimony clearly suggested that T.J. shot the victim while he waited in the car. This testimo-

ny, however, was directly at odds with the testimony of various other witnesses who identified defendant as the shooter—Prena and Jay Patel identified defendant as the shooter from photographic arrays and then again at trial, and Dwayne Daniels and Dale Hardy, defendant's friend and cellmate at the ACI intake center, respectively, each testified that defendant admitted to them that it was he who had shot and killed the victim.

We wholly reject defendant's argument that the holdings of various cases, including *Smith v. Groose*, 205 F.3d 1045 (8th Cir.2000), should have precluded the trial justice from instructing the jury on alternate theories of liability. In *Groose*, the prosecution advocated factually contradictory theories when prosecuting two defendants in different trials to secure convictions against each of them: "what the State claimed to be true [in one defendant's] case it rejected in [another defendant's case], and vice versa." *Id.* at 1050. The Eighth Circuit explicitly rejected such "foul" tactics by the prosecution and reasoned that "[t]he State's duty to its citizens does not allow it to pursue as many convictions as possible without regard to fairness and the search for truth." *Id.* at 1051. The present case is completely distinguishable from *Groose*. Here, the trial justice instructed the jury based on evidence presented at trial, not on any theory advocated by the prosecution. Thus, we find no error in the trial justice's instructions about vicarious liability.

## C. Aiding–and–Abetting Instructions

■ The defendant also objected to the trial justice's instruction to the jury that defendant could be convicted of murder as a principal or as an aider and abettor.[7] He told the panel that although

---

7. The trial justice said:

"Now, if you find the defendant not guilty

it was the state's theory that defendant was the shooter, defendant's own testimony suggested that he aided and abetted T.J. Patel in the murder of Sanjeev Patel. On appeal, defendant alleges that the aiding-and-abetting instructions were improper because they allowed the jury to convict defendant on inconsistent theories of liability.[8] The state contends that the instructions were adequate and appropriate, given the ample evidence of defendant's involvement in the murder. The state also argues that any error would not warrant reversal because the defendant was convicted as a principal in the murder, and thus in no way was prejudiced by the instruction.

■■■■■ We hold that the aiding-and-abetting instruction was appropriate in light of the substantial evidence presented at trial that could serve as foundation for a finding that defendant assisted T.J. Patel in the murder of Sanjeev Patel. "[O]ne who aids and abets in the commission of [a] crime and is also present at the scene may be charged and convicted as a princi-

pal." *State v. McMaugh*, 512 A.2d 824, 831 (R.I.1986) (citing *State v. Colvin*, 82 R.I. 212, 219–20, 107 A.2d 324, 328 (1954)). "Factors used in determining whether aiding and abetting exists include any association or relationship between the principal and those accused of aiding and abetting, as well as a defendants knowledge that a crime was to be committed." *State v. Evans*, 742 A.2d 715, 721 (R.I.1999) (citing *State v. Gazerro*, 420 A.2d 816, 828 (R.I. 1980)).

In this case, defendant's own efforts to exculpate himself suggested that he assisted T.J. in the murder of Sanjeev Patel. The defendant testified that he spent most of the day on January 1, the day of the murder, with T.J. Patel. He admitted to going into the Founder's Brook Motel and scoping out the lobby while pretending to be a customer, and talking with the victim, at T.J.'s request, immediately before the murder. He also testified that he remained in the car while T.J. went into the motel, and the two drove off together after T.J. returned. We agree with the trial justice that the jury could infer from all of

of conspiracy with Tajendra Patel to murder Sanjeev Patel then the State may prove these charges of murder and discharge of a firearm while committing a crime of violence, to wit: Murder, resulting in the death of Sanjeev Patel in two other ways or different ways, that is, either as a principal or as an aider and abettor. * * * [W]hen I say 'as an aider and abettor,' by proving beyond a reasonable doubt that the defendant, Graham, aided and abetted, or assisted Tajendra Patel, in carrying out these offenses. Now, as to aiding and abetting, the guilt of a defendant may be established without proof that the defendant who is on trial, that is Roger Graham, personally did *every act constituting the offenses charged.* The law provides that whoever aids, abets or assists another person to commit a crime is nonetheless criminally liable as a principal. The law holds that anyone who knowingly and *willfully* participates in the commission of a crime is responsible for that crime just as if he had committed the crime

alone. In other words, to convict the defendant as an aider and abettor, the State must prove beyond a reasonable doubt that the defendant shared in the criminal intent of the principal and was in some way a participant in the crime. In other words, the evidence must show that there was a community of unlawful purpose at the time the criminal act was committed and that the defendant was, in some fashion, a knowing, willing and active participant in it. Thus, in order to aid and abet another to commit a crime, it is necessary that a defendant willfully associate himself in some way with the criminal venture and willfully participate in it as he would in something he himself wishes to bring about."

8. As we previously stated, we see no error in the trial justice's instructing the jury on multiple theories of liability given the different testimonies of various witnesses.

these actions that defendant's role was "to render aid and assistance both as a getaway driver or as a lookout." Thus, based on defendant's own incriminating testimony that he assisted T.J. in the murder, we believe it was not only appropriate, but also necessary, for the trial justice to instruct the jury on aiding and abetting.

### D. Reasonable Doubt Instructions

■ When defining reasonable doubt for the jury, the trial justice instructed:

> " 'Reasonable doubt' by definition means a doubt founded upon reason and not conjecture or speculation. A reasonable doubt is a doubt based upon evidence or lack of evidence. Proof beyond a reasonable doubt exists when, after you have thoroughly considered and examined all of the evidence that is before you, you have a *firm belief* that the defendant is guilty as charged." (Emphasis added.)

The defendant objected to this instruction at trial and renews his opposition on appeal, arguing that the trial justice should have instructed the jury that a "firm lasting belief" was required to convict him. The state contends that there was no error in the instructions concerning reasonable doubt.

We conclude that the trial justice appropriately and adequately defined reasonable doubt for the jury as requiring, *inter alia,* a "firm belief" as to the defendant's guilt. We recently have upheld virtually identical jury instructions that included the same "firm belief" language. *See Imbruglia,* 913 A.2d at 1031–32; *see also State v. Anderson,* 752 A.2d 946, 951 (R.I.2000)

("the trial justice's use of the term 'firm belief' did not affect the propriety of the instructions and in no way would have misled or confused the jury"). Based on this precedent, defendant's argument fails.

### III

### Evidentiary Issues

■ Because the admissibility of evidence is within the discretion of the trial justice, this Court will not interfere with the trial justice's decision unless there is a clear abuse of discretion. *State v. Mohapatra,* 880 A.2d 802, 805 (R.I.2005) (citing *State v. Grayhurst,* 852 A.2d 491, 504 (R.I. 2004)). Using this standard of review, we address defendant's arguments concerning various evidentiary rulings at trial, including (1) the admission of Officer Travers' testimony about his conversation with Prena Patel and (2) the admission of Dale Hardy's testimony about his conversations with defendant at the ACI intake center.[9]

### A. Officer Travers' Testimony

■ During his direct examination, Officer Travers testified that when he first arrived at the Founder's Brook Motel, Prena Patel was "very upset, her eyes were very wide open, she was in a very excited state." He testified that her torso, hands, and face were covered in blood. Officer Travers then said that she "calm[ed] down after a period of time." Immediately after this testimony, the following exchange took place:[10]

> "Q. Was she able to provide you with any information, what did she tell you?

9. The defendant also argues that the trial justice erroneously excluded his own testimony regarding the absence of his family at trial, his prior bad acts, and his retention of a lawyer. Because these arguments are wholly without merit, we reject and do not address them any further.

10. At this trial, defendant was represented by Robert B. Mann, Esq., and was prosecuted by John Sullivan, Esq. and Pamela Chin, Esq.

"MR. MANN: Objection

"THE COURT: Grounds?

"MR. MANN: Hearsay

"MR. SULLIVAN: It's hearsay? Well, it could qualify as an excited utterance, although he said she calmed down. Apparently, she was still upset, excited.

"THE COURT: Objection is overruled. You can answer."

Officer Travers subsequently testified that he asked Prena who had shot her husband and she responded that the shooter was a black man wearing a black jacket.

On appeal, defendant argues that Officer Travers' testimony about Prena Patel's statements to him should not have been admitted because it was hearsay and did not qualify for the excited-utterance exception to the hearsay rule, see Rule 803(2) of the Rhode Island Rules of Evidence, because the only testimony on the record about Prena's condition was that she had calmed down before she spoke with Officer Travers. The state argues that the statements qualified as excited utterances because Prena still was laboring under the stress of the startling event and, even if improperly admitted, the admission of those statements was harmless given their cumulative nature.

■ Under Rule 803(2), "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is an exception to the rule prohibiting the admission of hearsay. "The rationale for the excited utterance * * * exception is that a startling event may produce an effect that temporarily stills the declarant's capacity [for] reflection and produces [at the same time] statements [that are] free of conscious fabrication." Rule 803(2) advisory committee's note. "The guarantee of trustworthiness [for the excited-utterance exception] is assured as long as the declarant made the statement as an 'instinctive outpouring' or as an 'effusion.'" State v. St. Jean, 469 A.2d 736, 738 (R.I.1983). Thus, a statement made in response to a traumatic or startling event qualifies as a spontaneous utterance if it was uttered while the declarant was still laboring under the stress of the experience. See State v. Creighton, 462 A.2d 980, 983 (R.I.1983).

■ In the context of this case, we believe that the trial justice did not err when he permitted Officer Travers to testify about Prena's description of the assailant. Even though she may have "calmed down" to some extent, it is clear that Prena still was covered in her husband's blood and she made her statements to Officer Travers shortly after she found her husband's wounded body.[11]

## B. The Testimony of Dale Hardy

■ At trial, defendant moved to preclude Dale Hardy from testifying, arguing that his testimony was inadmissible under Rules 404(b) and 403 of the Rhode Island Rules of Evidence.[12] The trial justice de-

11. Even if we considered the admission of this testimony to be in error, the error would be harmless, given the cumulative nature of the statement. Prena Patel herself testified that the person she saw leaving the motel office was a black man wearing a black jacket. Additionally, the jury listened to the 9–1–1 tape of Komal Patel, in which she identified the shooter as "black" per Prena's direction. Finally, Dereck Gensel, a long-term tenant at the Founder's Brook Motel, testified that Prena told him that the shooter was a black male.

12. Rule 404(b) of the Rhode Island Rules of Evidence reads:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes,

nied defendant's motion, reasoning that Hardy's testimony shed light on defendant's criminal intent with respect to Sanjeev's murder and its probative value outweighed any potential prejudice. Hardy then testified that while he and defendant were cellmates, defendant told him that his brother-in-law had hired him to kill Sanjeev Patel. Hardy also testified that defendant asked him to kill, or alternatively to find someone else to kill, Sanjeev's son Jay, who defendant had learned could identify him as the shooter. On appeal, defendant focuses his attention on this latter testimony, arguing that it was inadmissible under Rules 404(b) and 403. The state counters that the evidence was admissible because it was relevant, reliable, and its probative value outweighed its prejudicial impact.

After reviewing the record, we find absolutely no error in the admission of Dale Hardy's testimony regarding defendant's statement about Jay Patel because it was relevant with respect to defendant's consciousness of guilt about the murder of Sanjeev and its probative value outweighed any prejudicial impact it may have had. Under Rule 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." We have said that Rule 404(b) is designed to prohibit the introduction of evidence that is relevant only to show that the defendant is a bad person and, therefore, likely to have committed the offense with which he is charged. *See State v. Lemon*, 497 A.2d 713, 721 (R.I.1985). But, we also have

held that such evidence is admissible if it tends to establish "guilty knowledge, intent, motive, design, plan, scheme, system, or the like." *Id.* at 720 (quoting *State v. Colangelo*, 55 R.I. 170, 174, 179 A. 147, 149 (1935)). Thus, we have sustained the admission of evidence about a defendant's intimidating a witness because such evidence related to the defendant's consciousness of guilt with respect to the crime charged. *See Grayhurst*, 852 A.2d at 506.

▪ In this case, we conclude that the trial justice did not abuse his discretion when he admitted Dale Hardy's testimony about defendant's statements concerning Jay Patel because it was introduced as evidence that defendant committed one of the crimes with which he was charged, namely first-degree murder, and not merely as a prior bad act designed to attack defendant's character. In so holding, we also reject defendant's contention that Hardy's testimony was inadmissible under Rule 404(b) because it was unreliable, *see United States v. Hayden*, 85 F.3d 153, 159 (4th Cir.1996). We believe it was the province of the trial justice to determine the reliability of the witness's testimony, *see, e.g., Feleke v. State*, 620 A.2d 222, 227 (Del.1993), and because the trial justice did not find Hardy to be unreliable and defendant was afforded the opportunity to cross-examine the witness to expose any potential inconsistencies in his testimony, we will not disturb the ruling below.

▪ The defendant also argues that even if the testimony was admissible under Rule 404(b), it should have been excluded under Rule 403. Rule 403 provides that

such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable." Rule 403 states:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

"[relevant] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We have held that it is within the discretion of the trial justice to admit or exclude evidence under Rule 403. *See State v. Rice*, 755 A.2d 137, 152 (R.I. 2000). We have said that "[u]nless evidence is of limited or marginal relevance and enormously prejudicial, the trial justice should not act to exclude it." *Wells v. Uvex Winter Optical, Inc.*, 635 A.2d 1188, 1193 (R.I.1994).

Here, it is certainly reasonable to conclude that Hardy's testimony that defendant solicited him to kill the child witness may have had some prejudicial effect. However, we do not believe this prejudice was any more than that which "is always sustained by the introduction of relevant evidence intended to prove guilt." *State v.*

*Fenner*, 503 A.2d 518, 526 (R.I.1986) (citing *State v. Cline*, 122 R.I. 297, 330, 405 A.2d 1192, 1210 (1979)). Furthermore, the trial justice gave a cautionary instruction before admitting Hardy's testimony,[13] and again when he charged the jurors at the close of the evidence,[14] which mitigated any prejudicial impact. For these reasons, we see no abuse of discretion in the trial justice's decision to admit Hardy's testimony.

## IV

### Defendant's Motion for Acquittal

▇▇ At the conclusion of the state's case, and again at the close of all the evidence, defendant moved for a judgment of acquittal on the conspiracy charge based on Rule 29(a)(1) of the Superior Court Rules of Criminal Procedure.[15] The trial justice denied defendant's motion, finding that there was "an abundance of evidence to support a verdict of guilty on the charge

13. The trial justice said:

"Any testimony that you may hear from Mr. Hardy regarding alleged statements made by Mr. Graham, which some may argue or characterize as prior bad acts or bad conduct or misconduct, they are not-Mr. Graham has not been charged with anything other than what he is on trial for in this case. So therefore you are not to take any testimony from Mr. Hardy as any proof of alleged new offenses or crimes by Mr. Graham after the events of January 1st, 2002 which, as I say, is the subject matter of this trial, nor can you hold that as so-called or consider that as so-called prior, to this testimony, bad acts or and conduct, except on the certain limited issues going to—and the Court will instruct you further in this regard—as to how you may consider this testimony as far as so-called admissions against interest or guilty knowledge or consciousness. So I caution you not to consider it for any other purpose."

14. The trial justice instructed:

"To the extent that there has been testimony that on other occasions the defendant

was involved in other misconduct or what may be called misconduct, please bear in mind that the defendant has not been charged with any offense or offenses arising out of that alleged evidence that he committed any of the offense with which he is charged in this indictment."

15. Rule 29(a)(1) of the Superior Court Rules of Criminal Procedure says:

"Motions for a directed verdict are abolished and motions for a judgment of acquittal shall be used in their place. The court on motion of a defendant or on its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, after the evidence on either side is closed, if the evidence is insufficient to sustain a conviction of such offense or offenses. If a defendants motion for judgment of acquittal at the close of the evidence offered by the State is not granted, the defendant may offer evidence without having reserved the right."

of conspiracy." On appeal, defendant argues that the evidence presented at trial showed mere association between him and T.J. Patel, but that it did not even suggest a meeting of the minds to murder the victim. In contrast, the prosecution argues that when viewed in the light most favorable to the state, and drawing all reasonable inferences consistent with guilt therefrom, there was ample evidence to show that defendant conspired with T.J. Patel to murder Sanjeev Patel.

■ "In reviewing a claim of legal sufficiency of the evidence in the context of a motion for a judgment of acquittal, this Court applies the same standard as that applied by the trial court, namely, '[we] must view the evidence in the light most favorable to the state, * * * giving full credibility to the state's witnesses, and draw therefrom all reasonable inferences consistent with guilt.'" *State v. Otero*, 788 A.2d 469, 475 (R.I.2002) (quoting *State v. Snow*, 670 A.2d 239, 243 (R.I.1996)). "Viewing the evidence in this light, if the evidence could sustain a guilty verdict by the jury, the trial justice should deny the motion." *State v. Clifton*, 777 A.2d 1272, 1276–77 (R.I.2001) (citing *State v. Mattatall*, 603 A.2d 1098, 1105 (R.I.1992)).

■ There is no question that the evidence presented at trial, viewed in the light most favorable to the state, suggested an agreement between defendant and T.J. Patel to kill Sanjeev Patel. "Conspiracy is defined as a combination of two or more persons to commit an unlawful act or to perform a lawful act for an unlawful purpose." *State v. Mastracchio*, 612 A.2d 698, 706 (R.I.1992) (citing *State v. Parente*, 460 A.2d 430, 440 (R.I.1983)). Proof of the agreement beyond a reasonable doubt, including proof of its existence and scope, is all that is required for a defendant to be found guilty of the conspiracy. *State v. Disla*, 874 A.2d 190, 197 (R.I.2005) (quot-

ing *State v. Lassiter*, 836 A.2d 1096, 1104 (R.I.2003)). Direct evidence of an explicit agreement to commit an unlawful act and the existence and scope of a conspiracy often must be "inferentially established by proof of the relations, conduct, circumstances, and actions of the parties." *State v. Gordon*, 508 A.2d 1339, 1349 (R.I.1986) (citing *State v. Ahmadjian*, 438 A.2d 1070, 1084–85 (R.I.1981)).

We completely agree with the trial justice that when viewed in the light most favorable to the state, there was ample evidence to support a jury's finding that defendant conspired with T.J. Patel to commit the crime of murder. The defendant's own testimony implicated him in a conspiracy to murder and provided sufficient evidence to rebut a motion for a judgment of acquittal under Rule 29. He testified that he and T.J. drove together in T.J.'s car to the Founder's Brook Motel immediately before the shooting. The police later found an envelope in the trunk of that car on which was drawn a rough diagram of the motel's layout. The jury easily could have viewed this as evidence that defendant and T.J. were scheming to murder Sanjeev Patel.

The testimony of Carlos Walkes, Monty France, and Dwayne Daniels also suggested that defendant and T.J. were conspiring to kill the victim. Walkes, one of defendant's childhood friends from Barbados, testified that during the fall of 2001, defendant told him that T.J. Patel had a "job" for defendant that was going to get him the "big ride," referring to enough money to purchase a luxury vehicle. Similarly, France testified that defendant asked him to take part in a "job" for T.J. near Boston that involved a possible robbery or "roughing up." Finally, Daniels testified that defendant told him that on the afternoon before the shooting, T.J. Patel brought him to the motel to scope out the layout

and select a spot to meet after they finished "doing the job."

Criminal conspiracies are furtive by nature and unlikely to be illuminated by sunshine. We are of the opinion that there was more than sufficient evidence for a jury to find that defendant and T.J. Patel were engaged in a conspiracy to murder the victim. Thus, we find no error in the trial justice's denial of defendant's motion for judgment of acquittal on the conspiracy count.

## V

## Life Without Parole Proceedings and Sentence

### A. Murder for Hire

■■■ After the jury found defendant guilty of murder, the state pursued its previous recommendation of a life sentence without the possibility of parole, under § 11–23–2(3). Section 11–23–2 says in relevant part:

"Every person guilty of murder in the first degree shall be imprisoned for life. Every person guilty of murder in the first degree: * * * (3) committed at the

direction of another person in return for money or any other thing of monetary value from that person * * * shall be imprisoned for life and if ordered by the court pursuant to chapter 19.2 of title 12 that person shall not be eligible for parole from imprisonment."

Over defendant's objection, and in accordance with G.L. 1956 § 12–19.2–1,[16] the trial justice asked the jurors to determine whether they believed, beyond a reasonable doubt, that defendant killed Sanjeev Patel at the direction of T.J. Patel in exchange for money. The jury answered in the affirmative, making defendant eligible for a life sentence without parole.

On appeal, defendant argues that the jury should not even have been able to consider murder for hire because of the alternate theories of liability presented to the jury and because of a paucity of evidence that defendant was paid in advance for the murder. The state counters that its only theory during trial was that defendant, not T.J. Patel, was the shooter and that there was sufficient evidence that defendant *agreed* to kill the victim in return for money.

16. General Laws 1956 § 12–19.2–1 says:
"In all cases tried by a jury in which the penalty of life imprisonment without parole may be imposed pursuant to § 11–23–2 or 11–23–2.1, and in which the attorney general has recommended to the court in writing within twenty (20) days of the date of the arraignment that such a sentence be imposed, the court shall, upon return of a verdict of guilty of murder in the first degree by the jury, instruct the jury to determine whether it has been proven beyond a reasonable doubt that the murder committed by the defendant involved one of the circumstances enumerated in § 11–23–2 or 11–23–2.1 as the basis for imposition of a sentence of life imprisonment without parole. If after deliberation the jury finds that one or more of the enumerated circumstances was present, it shall state in writing, signed by the foreperson of the jury, which circumstance or circumstances it found beyond a reasonable doubt. Upon return of an affirmative verdict, the court shall conduct a presentence hearing. At the hearing, the court shall permit the attorney general and the defense to present additional evidence relevant to a determination of the sentence to be imposed as provided for in § 12–19.2–4. After hearing evidence and argument relating to the presence or absence of aggravating and mitigating factors, the court shall, in its discretion, sentence the defendant to either life imprisonment without parole or life imprisonment. If the trial court is reversed on appeal because of error only in the presentence hearing, the new proceedings before the trial court which may be ordered shall pertain only to the issue of sentencing."

We hold that it was completely appropriate for the trial justice to ask the jury to determine whether this killing was a murder for hire. To convict a defendant of murder for hire, the state must prove that (1) the defendant committed a murder, (2) at the direction of another, (3) in return for money. *See* § 11–23–2(3). Despite defendant's assertion to the contrary, we believe ample evidence was presented at trial that defendant killed the victim at T.J. Patel's request in exchange for money. First, there was substantial evidence that defendant was the one who shot and killed the victim. Both Prena and Jay Patel, who were extremely familiar with T.J. Patel and undoubtedly would have recognized him, instead identified defendant as the victim's shooter. Additionally, Dwayne Daniels and Dale Hardy both testified that defendant admitted to them that he had shot and killed the victim.

Second, there was sufficient evidence presented at trial that the murder was committed at the direction of T.J. Patel. The defendant testified that he came to Portsmouth on T.J.'s request and reconnoitered the Founder's Brook Motel lobby immediately before the murder at the direction of T.J. From such testimony, especially combined with the eyewitnesses' accounts, a jury reasonably could have believed that T.J. also directed defendant to kill the victim. Furthermore, evidence was adduced at trial that suggested that only T.J. had a motive to kill the victim. Various witnesses testified about T.J.'s intense anger toward Sanjeev Patel, who he blamed for breaking up his family, while defendant testified that he never had met, nor even heard of, the victim before January 1, 2002. Based on this evidence, a jury reasonably could have decided that defendant killed Sanjeev per T.J.'s request.

Finally, evidence was presented at trial that the murder was committed in exchange for money. The testimony of Det. Arrighi revealed that defendant did not have any significant sum of money in his possession when he searched him at the North Attleboro gas station one day before the murder; the detective did not find a wallet or any wad of bills after searching defendant's knapsack and pockets. However, when defendant arrived at the gas station in Warwick the following evening, after the shooting of Sanjeev Patel, he was seen carrying "a large wad of cash" and subsequently paid cab driver Edward Genier $375 in cash to drive him to Brooklyn.

■ Also, the defendant argues that § 11–23–2(3) must be read to require sufficient evidence that the money changed hands *before* the killing for a homicide to qualify as a murder for hire. We do not agree. No provision of § 11–23–2(3) makes such a prior payment a necessity, and we refuse to read such a requirement into the statute. *See State v. Lough*, 899 A.2d 468, 472–73 (R.I.2006). Rather, we agree with various other jurisdictions that have held that murder for hire requires an *agreement* to exchange money, rather than an actual exchange of money. *See State v. Carpenter*, 275 Conn. 785, 882 A.2d 604, 651–52 n. 26 (2005) (holding that the state's murder-for-hire statute required that there be "*an agreement between the defendant and the person hired * * * to cause the death of* [the victim] *and to pay the person hired monetary compensation*") (emphasis added); *see also People v. Patel*, 366 Ill.App.3d 255, 303 Ill.Dec. 560, 851 N.E.2d 747, 762 (2006) (holding that solicitation of murder for hire did not require that money change hands but only that there was some type of agreement or request for money or anything of value).

In light of all the evidence suggesting that defendant agreed to kill his helpless

victim, at the direction of T.J. Patel and in exchange for money, we believe that the trial justice was correct when he asked the jurors whether they believed, beyond a reasonable doubt, that this was a murder for hire.

## B. The Sentence Imposed

At defendant's presentencing hearing, the sentencing justice considered the arguments made by counsel as well as the testimony of Jay and Prena Patel regarding the impact of the murder on them. After considering both the aggravating and mitigating circumstances, pursuant to § 12–19.2–4,[17] he sentenced defendant to life in prison without the possibility of parole. He was persuaded by defendant's previous criminal record, his lying to the police during the criminal investigation, the testimony of defendant's cellmate about the potential murder of the child witness, and his lack of remorse for his actions. The sentencing justice also was persuaded that this maximum sentence would deter others from murdering for hire and would provide some comfort to the victim's family. The defendant has appealed his sentence to this Court, in accordance with § 12–19.2–5.[18] He maintains that the sentence was not warranted because of his lack of a violent criminal past and the nature of the homicide. The state counters that this Court should not disturb the trial justice's decision that appropriately was based on defendant's record, the circumstances of the crime, and the unlikelihood of defendant's rehabilitation.

■■■ "Because this case involves the imposition of a sentence of life without the possibility of parole, it is incumbent upon this Court to exercise its own independent judgment and discretion in determining the appropriateness of the sentence." *State v. Tassone*, 749 A.2d 1112, 1119 (R.I. 2000) (citing *State v. Travis*, 568 A.2d 316, 320 (R.I.1990)). In our independent review of such a sentence, we look to the record, the jury's findings, the trial justice's conclusions, and the character and propensities of the defendant, including any aggravating circumstances as well as any mitigating factors. Section 12–19.2–4; see *Tassone*, 749 A.2d at 1119.

■■■ After subjecting this record to our independent review, we hold that the sentence of life imprisonment without the possibility of parole was appropriate because the crime here belongs to the "narrow class of the most heinous crimes," for which we have reserved that sentence.

---

17. Section 12–19.2–4 reads:

"At the presentence hearing, following a finding that one or more of the circumstances enumerated in § 11–23–2 or 11–23–2.1 as the basis for imposition of a sentence of life imprisonment without parole was involved in the first degree murder of which the defendant has been convicted, the court shall consider evidence regarding the nature and circumstances of the offense and the personal history, character, record, and propensities of the defendant which are relevant to the sentencing determination. After hearing evidence and argument regarding the aggravating and mitigating circumstances relating to the offense and the defendant, the court shall, in its discretion, sentence the defendant to life imprisonment without parole or to life imprisonment. The court shall state on the record its reasons for imposing its sentence."

18. Section 12–19.2–5 provides:

"The defendant shall have the right to appeal a sentence of life imprisonment without parole to the supreme court of the state in accordance with the applicable rules of court. In considering an appeal of such a sentence, the court, after review of the transcript of the proceedings below, may, in its discretion, ratify the imposition of the sentence of life imprisonment without parole or may reduce the sentence to life imprisonment."

*State v. Brown,* 898 A.2d 69, 86 (R.I.2006). Our legislature undeniably has singled out those who commit murder for hire as deserving of the harshest penalties. Here, the jury unanimously found that defendant murdered Sanjeev Patel, an innocent man whom defendant never before had met, in exchange for money. The defendant shot and killed the victim in front of his eight-year-old son, forever changing the lives of the young boy and the victim's other family members. The defendant's actions reflect a complete disregard for human life, and, thus, warrant the harshest penalty. We reject defendant's assertion that this crime does not warrant a sentence of life without parole because of the nature of the crime, namely that it was a shooting, and not a stabbing or other type of homicide indicating savagery or intense brutality. The defendant was eligible for a sentence of life without parole because the killing was a murder for hire, *see* § 11–23–2(3), not because it was a torture or aggravated battery, *see* § 11–23–2(4).

Moreover, defendant's troubling character, record, and propensity for criminal activity persuade us that it is unlikely that he could be rehabilitated. The defendant has been engaged in a life of crime, including selling bootleg tapes and compact discs, installing bootleg cable, selling weapons, and selling drugs. Finally, after reviewing the record, we are unable to find any indication that defendant has, to this day, shown any real remorse for what he has done. *See State v. Bertoldi,* 495 A.2d 247, 253 (R.I.1985) (stating that defendant's remorse is an appropriate consideration in the imposition of a criminal penalty). For these reasons, we believe the trial justice's imposition of a sentence of life without the possibility of parole was warranted.

The cold-blooded and shocking nature of this act reveals a heart of stone and a character unconcerned with the standards of a decent and law-abiding society. We cannot in good conscience say that the citizenry ever would be safe if again exposed to this callous criminal. Therefore, we affirm the sentence of life without parole imposed by the trial justice.

## Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court in all respects and return the papers thereto.